[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION, RE: MOTIONS TO VACATE AND TO CONFIRM AWARD
Plaintiff moves to vacate an arbitration award and defendant seeks to confirm it.
FACTS RE: EVENT
CT Page 2747
John Marchesseault (Grievant) had been employed as a police officer for plaintiff for about nine years before January 8, 1992.
Conduct of a police officer in the Town is subject to the provisions of the collective bargaining agreement between the Parties; the South Windsor Police Services Duty Manual; the Department Operations Directive: and, those portions of the Personnel Rules and Regulations of the Town which do not conflict with the collective bargaining, agreement. All officers are given copies of each document and receive periodic updates during their service with the Town.
On January 8, 1992, towards the end of his 3 p. m. to 11 p. m. shift, the Grievant was working alone in a radio car when he was informed that the Director of the Recreation Department had called in a complaint. An employee of the recreation department had explained to his supervisor that as he was leaving an organized basketball game at the Ellsworth School, several young men had tried to gain access to the building to play basketball. He refused them entrance but also overheard one of the young men saying that he had a key to the building. The recreation employee felt they intended to return later to the building unauthorized once he had left. So the supervisor called the police to ask that a car go by the recreation building and check that there were no suspicious persons there in the school without permission to be there.
The dispatcher gave the Grievant the information, and approximately ten minutes later he drove to the building alone. As he pulled up, he could see lights in the hallway of the building. He radioed this information to headquarters, with additional information that lights seemed to be about to come on in the gym. The Grievant also told the dispatcher that he found a window that was kicked in or broken open at the rear of the gymnasium. At that point the dispatcher asked a second radio car to proceed to the school as backup. The Grievant knocked on the door, and received no response. Then the Grievant and his backup officer surveyed the situation. The Director showed up and unlocked the door. The Grievant went in first, then the other officer and the Director.
Through the window of the doors they could see seven young men playing basketball. Before actually entering the gym, the Grievant commented to the other officer that he intended to order CT Page 2748 them to the ground. He then drew his firearm, entered the gym. and yelled at everyone to get down on the floor. He continued to advance into the gym and then asked the other officer to pat them down to see if they had any weapons. The Grievant felt that he kept his weapon drawn for about one minute. He said that he never pointed the weapon directly at anyone but had it in a forty-five degree angle in the general direction of the young men.
Officer Nicoletta, who was at the scene, reported how he had asked the young men for their identification and went through the procedure of checking who they were. He also discussed with one of them the use of the key that was used to gain entrance to the building. He then decided to write up tickets for simple trespass which would result in a mail-in fine of fifty dollars each.
The Grievant said that, while writing the ticket, he and the other officer engaged in a discussion, during which the officer suggested that the Grievant had indeed overreacted. The Grievant admitted that the officer was correct. The Grievant conceded that both of them recognized there was no need for him to have pulled his gun out of the holster. He also acknowledged that there was some danger inherent in pulling out a loaded weapon.
On return to the Department, the Grievant went directly to the Sergeant and described what he had done. He explained that it was the end of the shift and his shift supervisor had already gone home.
The next work day, the Grievant took his first opportunity to speak to his Lieutenant and said. "I fucked up last night". Lieutenant Godin testified that he and the Grievant then had two "discussion/counseling sessions trying to determine what might have influenced this inappropriate behavior." He testified, further, that he and the Grievant did not reach a conclusion about the reason for the Grievant's conduct.
On or about January 13, 1992, the Chief received a letter of complaint dated January 11, 1992 from one of the mothers of the young men involved in the incident that occurred on January 8, 1992. The Chief assigned a Sergeant to investigate the complaint. The following represents the Chief's efforts to investigate the incident:
On January 14, 1992, the Sergeant interviewed the back-up officer on the call. A report from that officer was filed on CT Page 2749 January 15, 1992.
On January 14, 1992, the Sergeant interviewed and took a statement from the Director of Building Maintenance.
On January 15, 1992, an interview and statement was taken from one of the young men involved in the incident.
On January 15, 1992, the Captain received a memorandum from Lieutenant Godin, dated January 14, 1992, concerning the Grievant's actions during the January 8th incident.
On January 16, 1992, three citizen complaints were filed by young men involved in the January 8th incident. Statements were taken at that time.
On January 16, 1992, the Sergeant interviewed the Grievant about the incident in order to ask the reasoning behind his actions. They discussed a possible punishment and the Sergeant suggested that some retraining might be in order.
On or about January 21, 1992, Sergeant Murphy filed an overall report with the Chief.
The Chief reviewed the results of the various aspects of the investigation and the report. He discussed the situation with the Town Manager. They concluded the Grievant would submit to a fitness for duty examination.
On or about January 23, 1992, the Chief of Police called the Grievant in and reviewed the incident. The Grievant again admitted that what he had done was not proper. The Grievant was temporarily relieved of duty with pay pending the investigation into the incident on January 8th and an evaluation of the Grievant's fitness for duty.
On or about February 4, 1992, the Town requested a determination of the Grievant's fitness for duty by letter to Dr. Zeman of the Institute of Living. Along with the letter, the Chief provided to Dr. Zeman all of the information in his file gathered as part of the investigation, including information concerning an earlier incident in 1983, which had also resulted in a fitness for duty examination.
Dr. Zeman first met with the Grievant on February 12, 1992. CT Page 2750 After that initial meeting, Dr. Zeman requested by memo to Dr. Lothstein, the Director of Psychology at the Institute of Living, that he conduct a psychological testing and also render an opinion on the Grievant's fitness for duty.
Dr. Zeman met with the Grievant again on March 11, 1992. He received Dr. Lothstein's report of March 15, 1992. He then rendered an opinion contained in a six page letter which he sent to Chief Tyler on March 30, 1992. He states his opinion on the Grievant's fitness for duty in this letter, in part, as:
 It is my opinion that, at the time of my psychiatric interviews, Officer Marchesseault did not show signs of a major psychiatric illness. However, it is my further opinion that he has a significant potential for his mental and emotional functioning to decompensate in stressful situations. During such episodes of decompensation, he is prone to exercise poor judgment and to act in poorly controlled and impulsive manner. Once the stressful situation has passed, his thinking and behavior return rapidly to normal . . . It is my opinion that Officer Marchesseault's continued potential for unpredictable impulsive behavior and poor judgment prevent him at this time from being "fit for duty" from a psychiatric perspective. (Town Exhibit 22, pp. 5-6).
Dr. Lothstein administered a battery of psychological tests to the Grievant. He expressed his opinion in a memo to Dr. Zeman dated March 15, 1992, in which he states in part:
 Given the nature of his conflicts I do not see him a "fit for duty" if that means returning to police work with a gun that he may use inappropriately. His psychological test profile suggests that his underlying conflicts (his dependency need and masculine self image) and personality structure (histrionic, dependent, and passive) combined with his surfacing aggression and hostility make him a risk for acting inappropriately in high intensity situations. CT Page 2751
Dr. Zeman's report and that of Dr. Lothstein were conveyed to Chief Tyler on March 30, 1992.
In a letter dated April 9, 1992, the Town Manager set up a hearing for April 15, 1992, to discuss the results of the reports and the incident of January 8, 1992.
On April 20, 1992, a meeting was held with the Town Manager an the Grievant's lawyer.
In a letter dated April 28, 1992, the Town Manager terminated the Grievant from employment with the Town effective May 1, 1992. The Town Manager terminated the Grievant for violation of: Section 2.3.5, Unnecessary Force; Section 2.3.2, Conduct Unbecoming An Officer; Section 4.7.16, Guidelines and Procedures for the Use of Firearms; and, ruled him unfit for duty per the psychiatric evaluation dated March 30, 1992.
The Town Manager explained her decision as follows:
 The fact that it was centered around being fit for duty was obvious because I offered him a position as a police dispatcher, something for which he had previous employment and training.
 Although I'm not sure this is appropriate. I think that we feel fortunate that we have somebody with experience in that job because he's doing a good job as a police dispatcher. And so it was essentially centered around the fitness for duty and the carrying of the gun that the decision was made.
 And I felt I had a responsibility to provide the best service for the Town of Windsor's residents. And I thought that, based upon the reports that I had received from the two professionals, that there was some risk in continuing Officer Marchesseault as a police officer carrying a weapon.
On May 6, 1992, the Grievant filed a grievance with the Town stating that his termination was without just cause.
In a letter dated May 19, 1992, the Town Manager denied the CT Page 2752 grievance.
The Grievant was offered a position as dispatcher which he refused. Thereafter, he accepted the dispatcher position and began on July 19, 1992.
On or about January 25, 1993, the Grievant's attorney received a letter from an unknown person named Johnson, a person[1] with whom Grievant had sought counseling, indicating that the Grievant had been in counseling with him since about October 22, 1992. Mr. Johnson indicated that in his opinion, there was "no reason why he should not return to duty as an officer with the ability to carry and handle firearms. I will continue to work with John once he returns to active duty."
On or about November 30, 1993, Dr. Selig prepared a report based on interviews he conducted in June and July 1993 with the Grievant. He was of the opinion that because no one had diagnosed the Grievant as suffering from any particular mental illness, that he must then be fit for duty.
Dr. Griffith rendered his report regarding the Grievant on or about December 29, 1993.
Dr. Zeman reviewed all of the opinions and evaluative material produced by Dr. Anderson. Dr. Seng Dr. Griffith and Mr. Johnson in February 1994. He maintains that the Grievant was not fit for duty in early 1992.
The Panel found that "the Town acted reasonably and within its responsibilities by initiating an investigation of the incident." Further, the Panel found that "the Grievant acted in such an inappropriate manner based upon the expectations of the Town and his own knowledge of what was required during that incident, he should have been severely disciplined for his actions, and that some retraining and directed counseling were and are in order." In finding there was not just cause for termination, the Panel also stated, "This is not to say that we find that the Town acted unreasonably in relying on the view of its own medical experts."
Section 4.7.2 of the Duty Manual governing police conduct requires that an officer carry a gun.
The issues presented were found by the arbitration panel as CT Page 2753 follows:
 "1. Was the Grievant, officer John Marchesseault, terminated by the Town of South Windsor for just cause?
2. If not, what shall the remedy be?"
Arbitration hearings began July 15, 1994, and concluded March 4, 1994.
FACTS RE: ARBITRATION HEARING 
At the arbitration hearing, the Grievant testified that after his termination he sought a medical opinion as to his fitness for duty which would challenge the opinions of Dr. Zeman and Dr. Lothstein. On or about July 12, 1993, the Grievant obtained a medical opinion that he was "fit for duty" from Dr. Ronald Anderson. In November 1993, Dr. Seng prepared another report stating that the Grievant v., as fit for duty.
In the course of the Arbitration hearing, the Town attempted to elicit from the Grievant information regarding any opinions he sought or obtained as to his fitness for duty before July 1993. The Grievant's counsel objected. The Panel sustained the Grievant's objection.
The Panel found that "termination was excessive," and instead ordered that the Grievant be reinstated to his position as a police officer, subject to retraining and subject to his provision of a fitness for duty statement by a medical expert of his choice. The Award also requires the Grievant to continue counseling. The Panel did not award the Grievant back pay.
LAW
The award reads as follows:
 "The grievance is sustained in part and denied in part. The Grievant. Officer Marchesseault. Was not terminated for just cause. He shall be reinstated to his position as a South Windsor police officer subject to retraining: a current fitness for duty, statement: retraining in firearms: and counseling as outlined in the Analysis and Discussion CT Page 2754 section of the Award."
The issues on the appeal are the following:
I. Did the Panel improperly impose a higher burden of proof on the town and thus be guilty of misconduct under C.G.S. §52-418 (a)(3)?
II. Did the Panel's exclusion of certain evidence prohibit plaintiff from having a fair arbitration hearing?
III. Is the award in some way in violation of public policy?
A. The Panel's Award.
 1. The Panel Applied a Higher Burden of Proof in the Award Without Notice to the Parties or the Opportunity to be Heard Prior to Issuing the Award.
The Panel, stated in the Award that "the Town must prove that [the Grievant] is unfit to serve by more than a preponderance ofevidence for the termination to be sustained."
Originally the Town claimed that requirement to violate both C.G.S. § 57-418(a)(3) and (4). It does not pursue its claim under subsection (a)(4).
By adding the enhanced burden of proof to the terms of the arbitration the Panel has in effect amended and altered the provisions of the parties agreement. This it has no jurisdiction to do. Board of Education v. AFSCME, 195 Conn. 266, 271-272. The agreement itself in Article XXIX says that it "constitutes the complete and entire agreement between" the parties. In Article XXX entitled "Stability of Agreement" the following is set out:
 "30.1 No amendment, alteration or variation of the terms of this Agreement shall bind the parties hereto unless made and agreed to in writing by both parties."
The agreement does not provide that the Town has the burden of proof but does imply in Article XVII Sec. 17.2 that the Union might have the burden of proof in the following language:
 "17.2 The Union shall have the right to question the propriety of any such disciplinary CT Page 2755 action or charge, involving suspension, discharge or reduction in grade or rank, through the grievance procedure herein outlined, including arbitration."
Challengers, like plaintiffs, usually have the burden. However, the court makes no ruling in that regard.
As the court said in Board of Education v. AFSCME, supra 274, "the authority to arbitrate is strictly limited by the provisions of the collective bargaining agreement." These parties never asked for any amendment to the agreement in regard to the burden of proof but the Panel added their "own board of industrial justice" anyway. Id. 273. By doing this the Panel exceeded its authority under C.G.S. § 552-418(a)(3). The powers of the Panel are defined by the agreement. American Universal Ins. Co.v. DelGreco, 205 Conn. 178, 185. The Panel may take no action to the prejudice of a party unless permitted by the agreement.
B. Exclusion off Evidence.
The Panel refused to allow the Town to inquire as to whether Grievant has sought psychiatric or counseling services before possibly seeking it on or about October 22, 1992, some ten months after the incident with the gun, or seeking it before July 23, 1993, some 19 months after the incident. This decision was based on Grievant's refusal to disclose any psychiatric consultations under the protection of CGS § 52-146. In fact there is a clear exception to that protection under CGS § 52-146f(5). Thus there was no reason to exclude the evidence.
The town claims that if Grievant disclosed going to other medical persons for psychiatric or counseling help and did not produce the results the Panel could easily question his condition at that prior time and might conclude he was found not fit for duty.
As the Panel makes clear, the medical findings as to Grievant's fitness for duty were very important. The Town argues that as a result of this evidentiary ruling it was deprived of a full and fair hearing before the Panel. The law agrees. O G/O'Connell Joint Venture v. Chase Family Limited Partnership No.3, 203 Conn. 133, 149.
C. Tests.
CT Page 2756
The Panel in its statement of Analysis and Discussion states it "reviewed the matter in light of certain universally tests for just cause", p. 30, and then lists the following:
1. Was the employee warned of the consequences of his misconduct?
 2. Was the employer's rule or order reasonably related to safe and efficient operations?
3. Did the employer investigate before administering the discipline?
 4. Did the investigation produce substantial evidence or proof of guilt?
 5. Were the rules, orders, and penalties applied evenhandedly and without discrimination?
The court is not referred to any source for these tests. The court can find no reason for the Panel to choose them and use them. They do not appear in the labor agreement.
The Panel did recognize as a standard Article I Section 1.2(b) of the union contract which gives power to the "Town and the Chief of Police" "to discipline and dismiss for just cause."
D. TIME OF FITNESS
The Panel speaks of Grievant being fit in the present tense, i.e. May or June of 1996. The Panel of course might have relied on the Town's evidence that it had from March 1992 in regard to Grievant's fitness for duty. They might also have relied on some or all of the Grievant's evidence thereafter through July 11, 1993. If they did rely on this later evidence they would be speaking in the past tense as to his fitness. Is that the time to decide "just cause" for a dismissal effective May 1, 1992? The Town's position before the Panel was whether it acted reasonably at the time it dismissed Grievant. There is no finding by the Panel that Grievant was fit for duty on or about the time of the termination on April 28, 1992. There is evidence from Dr. Zeman that as of March 15, 1992 he was not fit for duty. The issue as formed by the Panel is, "Was the Grievant . . . terminated . . . for just cause."
He was terminated on April 28, 1992 and thus that is the date CT Page 2757 the Panel had to consider when deciding his fitness for duty.
CONCLUSIONS
1. The Panel improperly imposed an excessive burden of proof on the Town.
2. The Panel had to allow the evidence of Grievant's purported search for mental help between the time of his termination because there is no reason to keep it out and that his mental health evaluation was of such great importance to the Panel.
3. The Panel used "tests" to which the parties never agreed.
4. The Panel evaluated the Grievant's fitness and the Towns action as of 1996 rather than at the time of the Town's action.
Motion to Vacate is granted.
Motion to Confirm is denied.
O'Neill, J.